JOE PARSONS V. THE STATE.

No. 2479.  Decided May 28, 1913.

Murder—Charge of Court—Murder in the First Degree—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence showed a case of murder in the first degree and the court submitted both degrees of murder and self-defense and the jury found defendant guilty of murder in the first degree, there was no error.

Appeal from the Criminal District Court of Dallas No. 2.  Tried below before the Hon. Barry Miller.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*Pierson & Pierson,* for appellant.—On the question of the absence of express malice: Snowberger v. State, 58 Texas Crim. Rep., 530, 126 S. W. Rep., 878; Farrer v. State, 42 Texas, 265; Sharpe v. State, 17 Texas Crim. App., 486; Lewis v. State, 15 id., 647; McCoy v. State, 25 Texas, 33; Jordan v. State, 10 id., 479; Harrell v. State, 41 Texas Crim. Rep., 507; Burnham v. State, 43 Texas, 322; Ferrell v. State, 43 id., 503; Summers v. State, 5 Texas Crim. App., 365; Sherar v. State, 30 Texas Crim. App., 349; Franklin v. State, 30 id., 628; Duebbe v. State, 1 id., 159; Jones v. State, 29 id., 338; Hall v. State, 33 Texas Crim. Rep., 191.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Judge.—Appellant was convicted of murder in the first degree and life imprisonment inflicted.

Appellant submits one issue only to be decided by this court, expressly waiving all other propositions and questions raised in the case.

His proposition is that the court below erred in submitting to the jury for a finding, murder in the first degree. He concedes that the charge of the court on murder in the first degree is a correct and approved charge.

The court also submitted murder in the second degree. Appellant concedes that that charge is a correct and approved charge on murder in the second degree. The court also submitted properly self-defense to which there is no complaint. It is unnecessary here to state any further of the court's charge. We will state whatever is necessary hereinafter.

As appellant's sole contention is as above stated, claiming that the evidence did not justify the submission of murder in the first degree, we will give in substance the full of the testimony raising that question. It will be unnecessary to give the evidence on any other issue.

The killing occurred about 4 or 5 o'clock in the evening of November 30, 1912. Outside of appellant, only one witness was present who witnessed the killing. The evidence does not show any previous difficulty between appellant and deceased. Appellant testified that he and deceased "had never had any trouble before and were friends." He also testified that he and deceased had been drinking that day. No evidence by him or any other witness that he or deceased were drunk. He also testified, "Henry Scott (deceased) was always pretty quarrelsome when he was drinking."

Mack Hill was the only witness present immediately before and at the time of the killing. After testifying that he had known appellant some years and deceased five or six months, and telling about where said parties, respectively, had worked for some time, and that appellant, deceased and himself were boarding, or had rooms, one or the other, or

both, at Dock Dennis' house in Dallas, fixing the number and street on which the house was situated, and that they were all in this house at the time of the killing, he further testified: "When I first came into the room (the room where appellant and deceased were and where the killing occurred) I came in through the west door, which is near where the head of the couch was. When I entered the room Henry Scott (deceased) was standing in the room there somewhere and Joe Parsons (appellant) was also standing there in the room. They were not doing anything when I entered the room, but Henry Scott asked Parsons did he want to play cooncan, and Parsons says, 'No, but I'll deal monte,' and Henry says, 'I don't want to play monte,' and Parsons says, 'Well, there won't be any game then.' Then I passed through into the other room. I went on in the kitchen at that time. It was thirty or forty minutes before I went back in the room again where the killing occurred. When I went into the room the second time Henry was sitting down on the sofa, and Parsons was sitting down on the bed near the head of the bed, his elbows were leaning on the head of the bed, and his left hand and elbow on the bed. Parsons' face was toward the foot of the couch. Parsons was sitting on the bed when I opened the door. He was sitting on the side of the bed right at the foot of the couch, and I came right in and sat down on the chair. There was a door from that room into the west room and then there was another door into the middle room, and when Parsons got up he came around like he was going to this door to the south room. I never saw Parsons with any knife at all. I never saw Parsons strike but one blow, but I thought he hit Scott twice, but I do not know whether he hit him the second time or not. I never saw anything in the hands of Henry Scott. I was looking at them both at the time, but I wasn't noticing particularly whether either one of them had anything. . . . Henry Scott never did get up off the couch after he was struck. There was a whole lot of blood that dripped from Scott. Blood was on the wall and blood on the couch. At the time Scott was struck he had his head in his hands."

He further testified: "On the evening of November 30th, 1912, I had been at Dennis' house thirty or forty minutes before the killing occurred, and had been in the room where the killing took place about a minute and one-half when the killing occurred. I had been over to the market, and passed by there and stopped. This was about 4:30 or 5 o'clock in the evening. I saw Henry Scott in the west end room of that house, which is the first room from the street. I walked into the room and when I pushed the door open, Henry Scott said to Joe Parsons, 'You owe me 30 cents.' Parsons said, 'I do not owe you anything.' By that time I had got to the couch where Henry was sitting and the chair there by the side of it, and I sat down in the chair. Parsons got up and he started like he was going to the door, and by the time he got just behind me, Henry says, 'You do owe me 30 cents,' and Parsons says, 'I don't owe you nothing, you son-of-a-bitch,' and hit him, and I says, 'What is the matter with you?' and when I looked around blood was streaming

from Henry Scott's neck. Parsons hit Henry right over my head. I got up when he hit him and asked him what was the matter with all of them, and then I saw the blood streaming from this fellow Henry Scott. The couch was sitting in the west end of the room crossways, there was also a bed in the room right at the foot of the couch. It was a cane-bottom stool chair that I was sitting in about one and one-half feet from the couch."

On cross-examination, he testified: "There were four rooms to that house. At the time of the killing the door of that room was closed when I went in. At the time the blow was struck by Parsons I could not say whether Scott was between Parsons and the door or not. I do not know exactly how close Parsons was to the door at that time. I think both of them were about the same distance from the door. I thought at first that Parsons was going towards the door, there was nobody between Parsons and Scott when Parsons struck him. Parsons struck over my shoulder. Immediately after the killing the undertaker was phoned for and a great many people gathered,—Scott's wife and other people. I do not know whether Scott had a knife or not at the time of the killing. Scott was 'sorter' angling to my left side. I do not know what kind of motion Scott made, because I did not see him at that time. He might have made one while my side was to him. I do not know exactly how close Parsons was to Scott when he hit him because he was behind me at the time he hit him. Defendant struck Scott with his right hand."

Nettie Hampton, for the State, testified that she knew appellant and had seen deceased four or five times, but was not personally acquainted with him; that she knew appellant about three years and heard of the killing. Then said: "I saw the defendant at 9 o'clock on Saturday night following the killing. He was at my house, and my house is not so far from the place of the killing,—is about three blocks, I think. Defendant had been to my house before that night, he used to room and board with me. On this night defendant asked me if I had been to Dock Dennis' house, and I told him 'Yes,' and he asked me if the son-of-a-bitch was dead. I told him I guessed he was, the undertaker had him. He was talking about Henry Scott. Then he says he wanted somebody to go get his coat from over there. Defendant stayed at my house about fifteen or twenty minutes. He was drinking at that time. I don't know if anybody got his coat for him or not, and he did not tell me where he was going, and did not tell me anything about how the killing happened. He said he had killed Scott but did not say why he had killed him."

Lula Scott, the wife of deceased, after testifying that she had been at the house of Dennis, where the killing occurred, about fifteen minutes before the killing, and that she did not see it and knew nothing about it until immediately after it occurred, testified: "I was in the kitchen at the time. When I went in the room I found my husband in there dead; he was lying cross-ways of the couch, on the couch with his feet

on the floor. He was about half-way on the couch. I saw the blood on the couch and I did not see any weapon around there. Joe Parsons had come out of the room when I got in there. I saw him come because he came right through the room where I was and went out on the porch. I says to him: 'Joe Parsons, you killed my husband,' and he says, 'Yes, and if you don't turn me loose, I will kill you.' And then he went on south on Preston Street, and he had a knife in his hand at that time. It was a red handled pocket-knife with a long, keen blade. Just like the knife now shown to me." On cross-examination she said: "If my husband was drinking that evening I did not know it."

John Skinner, witness for appellant, among other things, testified: "I saw her (Lula Scott, deceased's wife) run up to Parsons or towards him. I do not know if she said anything or not, but was halloing." That he was about twenty feet from her at the time and he never heard Parsons tell her if she did not get away he would kill her. On cross-examination he testified that he did not see Lula Scott grab Parsons by the arm. "I told the women there in the house that Henry had got cut, and told this woman not to run onto Parsons. . She may have grabbed Parsons by the arm, but I did not know that she did. I swore before the grand jury that Henry's wife ran out after I told them that Henry had got cut, and I says, 'Don't you run onto that man,' when . she grabbed Parsons by the arm and he jerked loose."

The knife with which the killing was done was produced, identified and introduced in evidence by the State. One of the witnesses for the State testified that he found and arrested appellant in Fort Worth Sunday night in the night after he had gone to bed, the killing having occurred the Saturday evening before, as stated above. This officer testified that he found on appellant's person "a long-bladed, red-handled pocket-knife. . . . The blade of the knife was between four and four and a half inches long."

John Whitfield, an undertaker, testified: "I remember when this defendant killed Henry Scott. I went to the place where the killing occurred, a block from Central Avenue on Preston Street, in the City of Dallas, Dallas County, Texas. When I got there I found the body of Henry Scott. He was dead. I found the body of Henry Scott in the west room on a couch, with his throat cut, severing the carotid artery. The cut began at the lower tip of the left ear and ranged downward to the Adam's apple. His head was nearly severed from his body, and was hanging by a piece of skin. It looked like the cut was made by sticking the knife in the back of the deceased's neck, and drawing it clear round to the front."

The court charged on murder in the first degree. After giving the style and number of the cause, court and the term, it is:

"Gentlemen of the Jury: The defendant stands charged by indictment with the offense of the murder of Henry Scott, alleged to have been committed in the County of Dallas and State of Texas, on or about the 30th day of November, 1912. To this charge the defendant has pleaded 'Not guilty.'

"I give you in charge, as the law applicable to this case, the following:

"1.   Every person with sound memory and discretion, who shall unlawfully kill any reasonable creature in being, within the State, with malice aforethought, either express or implied, shall be deemed guilty of murder.

"2.   Murder is distinguishable from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide.

"3.   Malice is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken.

"4.   Malice, which is absolutely essential to constitute the offense of murder, is either express or implied.

"5.   All murder committed with express malice is murder in the first degree.

"6.   Express malice, which is absolutely essential to constitute murder in the first degree, is where one with sedate, deliberate mind and formed design unlawfully kills another.

"7.   When an unlawful killing is established, the condition of mind of the party killing, at the time, just after the killing, is an important consideration in determining the grade of the homicide; and in determining whether murder has been committed with express malice or not, the important questions for a jury to consider are:  Do the facts and circumstances in the case at the time of the killing, and before and after that time, having connection with or relation to it, furnish satisfactory evidence of a sedate and deliberate mind, on the part of the person killing, at the time he does the act?  And do these facts and circumstances show a formed design to take the life of the person slain, or to inflict on him some serious bodily harm, which, in its necessary and probable consequences may result in his death?  Or, do the facts and circumstances in the case show such a general reckless disregard of human life as necessarily includes the formed design against the life of the person slain?  If they do, the killing, if it amounts to murder, will be upon express malice.

"8.   In order to warrant a verdict of murder in the first degree, express malice must be shown by the evidence to have existed—that is, the jury must be satisfied from the evidence, beyond a reasonable doubt, that the killing was a consummation of a previously formed design to take the life of the person killed, and that the design to kill was formed deliberately, with a sedate mind, that is, at the time when the mind of the person killing was self-possessed and capable of contemplating the consequences of the act proposed to be done.  There is, however, no definite space of time necessary to intervene between the formed design to kill and the actual killing.  A single moment of time may be sufficient.  All that is required is that the mind be cool and deliberate in forming its purpose, and the design to kill is formed.

"9.   When the evidence satisfies the mind of the jury, beyond a rea-

sonable doubt, that the killing was the result of a previously formed design by the defendant to kill the deceased, and that the design was formed when the mind was calm and sedate and capable of contemplating the consequences of the act proposed to be done by him, and such killing is further shown to have been unlawful and done with express malice, then the homicide is murder in the first degree, and your verdict shall be rendered accordingly.

"10. To warrant a conviction of murder in the first degree, the jury must be satisfied by the evidence beyond a reasonable doubt, that the defendant, before the act, deliberately formed the design with a calm and sedate mind to kill deceased; that he selected and used the weapon or instrument reasonably sufficient to accomplish the death by the mode and manner of its use. The act must not result from a mere sudden, rash and immediate design, springing from an inconsiderate impulse, passion or excitement, however unjustifiable and unwarrantable it may be.

"11. Now, if you believe from the evidence, beyond a reasonable doubt, that the defendant, Joe Parsons, did, in the County of Dallas and State of Texas, on the 30th day of November, 1912, as charged in the indictment, with express malice aforethought, with a knife being a deadly weapon, or instrument well calculated and likely to produce death, by the manner in which it was used, with a sedate and deliberate mind and formed design to kill, unlawfully cut and stab and thereby kill said Henry Scott, you will find him guilty of murder in the first degree, and so state in your verdict, affixing the penalty therefor.

"12. The punishment for murder in the first degree shall be by death or by confinement in the State penitentiary for life, as the jury may determine and state in their verdict."

This charge on murder in the first degree was followed by a correct and full charge on murder in the second degree. Following that with this, in a separate paragraph: "If from the evidence you are satisfied beyond a reasonable doubt, that the defendant is guilty of murder, but have a reasonable doubt whether it was committed upon express or implied malice, then you must give the defendant the benefit of such doubt, and not find him guilty of a higher grade than murder in the second degree." And concluded the charge as follows: "In all criminal cases the burden of proof is on the State.

"The defendant is presumed to be innocent until his guilt is established by legal evidence, beyond a reasonable doubt; and in case you have a reasonable doubt as to the defendant's guilt you will acquit him, and say by your verdict, 'not guilty.'

"You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony, but you are bound to receive the law from the court, which is herein given you, and be governed thereby."

It is useless to quote the statutes or cite or quote the decisions. All of the law of murder in the first degree is so fully, completely and aptly

charged in the court's charge on murder in the first degree that no discussion on our part could amplify or elaborate the law on the subject.

We have again read and studied this evidence and the charge, and the law applicable to the question, and we are convinced that the court did not err in submitting murder in the first degree and that the evidence justifies the verdict.

This being the sole question, as repeatedly stated by appellant, the judgment will be affirmed.

*Affirmed.*